UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN DOE, et al.,

                    NO. CIV. S-06-1043 LKK/DAD

     Plaintiff,

    v.                       O R D E R

THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA, et al.,

     Defendants.

_____/

Plaintiffs, Doe-Child, Roe-One Child, Roe-Two Child and their parents, John Doe and Jane Roe, (collectively, "plaintiffs") bring suit against the defendants for alleged violations of their civil rights. Defendants include Kevin Patrick Coulter, M.D. and Sheridan Miyamoto, R.N.

Plaintiffs plead the following causes of action against both defendants Coulter and Miyamoto: (1) 42 U.S.C. § 1983 (violations of civil rights); (2) 42 U.S.C. § 1985 (conspiracy to interfere with civil rights); (3) 42 U.S.C. § 1986 (neglect to prevent interference with civil rights). The plaintiffs' fourth and fifth

1

1  causes of action, for assault and battery and invasion of privacy,

2  directed against defendant Coulter only.

3      Pending before the court are defendants' Coulter's and

4  Miyamoto's motions for summary judgment on all causes of action.[1]

5  The court resolves the motion on the papers and after oral

6  argument.

## I. FACTS[2]

8      The case concerns the removal of the plaintiff children

9  from their parents pursuant to actions taken by Child Protective

10 Services ("CPS"). On May 11, 2004, a CPS case worker went to the

11 plaintiffs' home after the agency had received information of

12 the possibility of nonsexual child abuse. The case worker

13 requested that the Jane Roe bring the children to the

14 UCDMC/CAARE office, so that they could receive a medical exam.

15 Plaintiff Jane Roe disputes that she fully understood the case

16 worker's requests, as she is a native Vietnamese speaker with

17 assertedly little understanding of English. Plaintiffs'

18 Opposition to Statement of Undisputed Material Facts ¶ 3;

19 Declaration of Jane Roe In Support of Plaintiffs' Opposition to

20

21

---

22     [1]Defendant County of Sacramento filed a motion for summary
   judgment as well. The plaintiffs do not oppose this motion. The
23 motion is granted and the County of Sacramento is hereby dismissed
   from this action.
24
       [2]The facts are undisputed unless otherwise indicated. Each
25 side has lodged objections to various pieces of evidence offered
   by the other. To the extent that the court relies on that evidence
26 in this order, those objections are OVERRULED.

1  Defendants' Motion for Summary Judgment ("Roe Decl.") ¶ 2.[3]

2  Nevertheless, Jane Roe and her children went to the CAARE

3  facility and were met there by the case worker.

4       The parties dispute what occurred when the plaintiffs and

5  the case worker arrived at the CAARE center. Defendants contend

6  that the case worker again explained to Jane Roe that she (the

7  case worker) wanted all of the plaintiff children to undergo

8  physical examinations, and that Jane Roe consented to this.

9  Statement of Undisputed Material Facts (SUF) ¶ 6. It is the

10  policy of CAARE to obtain consent for medical exams performed

11  there. Plaintiffs contend that Jane Roe did not receive an

12  explanation of what was to occur at the CAARE center and there

13  was no Vietnamese interpreter provided for her. Plaintiffs'

14  Opposition to Statement of Undisputed Material Facts ¶ 6. It is

15  undisputed that Jane Roe did not sign consent documents for the

16  physical examinations, nor was she asked to do so.

17       The CPS case worker informed defendant Miyamoto that Jane

18  Roe had consented to the exams, and Miyamoto then performed a

19  physical examination of the plaintiff children. Miyamoto is a

20  registered nurse and family nurse practitioner, and contends

21  that she specializes in child abuse and neglect examinations.

22  Although Miyamoto does not remember these specific examinations,

23  it is her practice to determine whether the parent or legal

24  guardian of a child has consented to the exam before she

25  _____

26       [3]The plaintiffs' command of English is a fact in dispute.

performs it. It is also her practice to explain to the parent

what the exam will entail and that the child or the parent could

interrupt her at any time during the exam. Jane Roe was present

during the examinations of the children, although she maintains

that she did not receive any information about the exams that

she was able to understand. Plaintiffs' Opposition to Statement

of Undisputed Material Facts ¶ 13. Miyamoto counters that if she

had received the impression that Jane Roe did not understand the

explanation, she would not have proceeded with the examination.

SUF ¶ 15.

Miyamoto performed physical exams of the plaintiff

children. As part of the exams, she examined the genitals of the

children. For the plaintiffs girls, Roe-One Child and Roe-Two

child, this involved a visual inspection of the outer portions

of their genitals. Miyamoto also inspected the vestibule and

hymen of the plaintiff girls, by separating the labia with her

gloved hand.[4] The purpose of this was to determine if there was

---

[4]In their opposition papers, the plaintiffs repeatedly mention a colposcopy exam that was performed on May 13, 2004. At oral argument, plaintiffs' counsel stated that the causes of action are premised on allegations regarding this examination as well as the May 11, 2004 exam.

Based on the evidence before the court, the May 13, 2004 exam was a follow-up to the May 11, 2004 exam and occurred after the children had been removed from the custody of their parents. Roe Decl. ¶ 5; Affidavit of Steven Gabaeff In Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Gabaeff Aff.") ¶ 3.C. As such, it does not appear to be the basis of the plaintiffs' causes of action. See First Amended Complaint ¶ 16 (only reference to the physical examinations in the complaint refers to the exams performed prior to the children being placed in protective custody, which occurred on March 11, 2004). In their answers to interrogatories, the plaintiffs appeared also to confirm

1  evidence of disease or trauma to the area. It is a typical part

2  of any yearly wellness exam for girls. Photographs were taken

3  during the exams, for later review by CAARE staff.

4      After the exam, Miyamoto communicated to the case worker

5  that she was concerned about possible traumatic injury to the

6  genital areas of the girls. According to the plaintiffs, CPS

7  took all of the children into custody that day. Roe Decl. ¶ 5.

8  The plaintiffs also report that on May 13, 2004, the plaintiff

9  girls were subject to a more extensive gynecological exam, a

10 colposcopy. Gabaeff Aff. ¶ 3.C.

11      On May 24, 2004, a group of CAARE staff, including

12 defendants Miyamoto and Coulter, reviewed the photographs taken

13 during the exams in order to evaluate whether there was

14 indication of abuse. This is said to be essentially a "quality

15 assurance" function, to review previously-made medical

16 determinations. The review team concluded that the photographs

17 showed evidence consistent with trauma to the plaintiff girls'

18 genitals.

19 _____

20 that their causes of action against defendants Miyamoto and Coulter
   were based only on alleged improper conduct surrounding the May 11,
21 2004 exams. See Declaration of Robert Tyler In Support of Summary
   Judgment on Behalf of Defendants Miyamoto and Coulter ¶¶ 2-5, Ex.
22 A (Plaintiff Doe Child's Response to Interrogatories 7:1-7:5, 7:22-
   7:25, 8:1-8:7); Ex. B (Plaintiff [Roe-One Child's] Response to
23 Interrogatories 7:5-7:13, 8:7-9:27); Ex. C (Plaintiff [Roe-Two
   Child's] Response to Interrogatories 7:5-7:13, 8:7-9:27); Ex. D
24 (Plaintiffs John Doe and Jane Roe's Response to Interrogatories
   7:1-7:9, 9:1-9:13, 10:1-11:2).
25      As the court instructed plaintiffs' counsel at oral argument,
   if the plaintiffs wish to allege causes of action premised on the
26 May 13, 2004 exams, they must move to amend the complaint.

1    Defendant Coulter, as the medical director of CAARE, was

2  Miyamoto's supervisor at the time of the examination. He was not

3  present during the May 11, 2004 exams. The plaintiffs allege

4  that Coulter was involved in selecting CAARE staff to

5  participate in weekly "SCAN" meetings. Declaration of Anthony

6  Palik in Support of the Defendants' Motion for Summary Judgment

7  ("Palik Decl.") ¶ 9, Ex. H. SCAN meetings are meetings of

8  representatives of CAARE, CPS, law enforcement agencies and

9  sometimes the district attorneys' office, in which the

10 participants discuss recent child abuse and neglect cases and

11 the progress of each.

12   The plaintiffs allege that Miyamoto violated their federal

13 civil rights by (1) conducting invasive physical examinations of

14 the plaintiff children on May 11, 2004, and (2) being involved

15 in the decision to remove the plaintiff children from their

16 family home.[5] SUF ¶¶ 1-2; First Amended Complaint ¶¶ 15, 16, 27,

17 35, 43.

18   The plaintiffs allege that Coulter violated their federal

19 civil rights by (1) leading the SCAN Committee, which "made the

20 ultimate determination as to whether . . . the plaintiff

21 children were likely victims of sexual abuse," (2) drafting the

22 California Office of Emergency Services' California Medical

23 Protocol for Examination of Child Abuse and Neglect Victims,

24 utilized by CAARE staff, and (3) participating in the review of

25 ———————————

26   [5]On August 29, 2006, the court dismissed the state law claims
   as alleged against Miyamoto.

6

the photographs taken during the May 11, 2004 exam.[6] SUF ¶¶ 30-

31. Finally, the plaintiffs Roe-One Child and Roe-Two Child

allege that Coulter is vicariously liable for the tort of

assault and battery committed on them, and that he violated

their right to privacy under state law by "authorizing,

ratifying and affirming" the May 11, 2004 exam.

## II. SUMMARY JUDGMENT STANDARDS UNDER FEDERAL RULE
## OF CIVIL PROCEDURE 56

Summary judgment is appropriate when it is demonstrated

that there exists no genuine issue as to any material fact, and

that the moving party is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress &

Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51

F.3d 848, 853 (9th Cir. 1995).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing
> the district court of the basis for its motion, and
> identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it
> believes demonstrate the absence of a genuine issue of
> material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here

the nonmoving party will bear the burden of proof at trial on a

dispositive issue, a summary judgment motion may properly be

---

[6]The plaintiffs had previously alleged that Coulter also
violated their civil rights by approving and ratifying Miyamoto's
conduct and by being her supervisor. In their opposition, they
abandon these grounds for their claims. See Opposition to
Defendants' Motion for Summary Judgment at 6.

made in reliance solely on the 'pleadings, depositions, answers
to interrogatories, and admissions on file.'"  Id.  Indeed,
summary judgment should be entered, after adequate time for
discovery and upon motion, against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will
bear the burden of proof at trial.  See id. at 322.  "[A]
complete failure of proof concerning an essential element of the
nonmoving party's case necessarily renders all other facts
immaterial."  Id.  In such a circumstance, summary judgment
should be granted, "so long as whatever is before the district
court demonstrates that the standard for entry of summary
judgment, as set forth in Rule 56(c), is satisfied."  Id. at
323.

     If the moving party meets its initial responsibility, the
burden then shifts to the opposing party to establish that a
genuine issue as to any material fact actually does exist.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv.
Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

     In attempting to establish the existence of this factual
dispute, the opposing party may not rely upon the denials of its
pleadings, but is required to tender evidence of specific facts
in the form of affidavits, and/or admissible discovery material,
in support of its contention that the dispute exists.  Fed. R.
Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First

1  Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954

2  (9th Cir. 1998).  The opposing party must demonstrate that the

3  fact in contention is material, i.e., a fact that might affect

4  the outcome of the suit under the governing law, Anderson v.

5  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local

6  No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347,

7  355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific

8  Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and

9  that the dispute is genuine, i.e., the evidence is such that a

10 reasonable jury could return a verdict for the nonmoving party,

11 Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g

12 & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

13      In the endeavor to establish the existence of a factual

14 dispute, the opposing party need not establish a material issue

15 of fact conclusively in its favor.  It is sufficient that "the

16 claimed factual dispute be shown to require a jury or judge to

17 resolve the parties' differing versions of the truth at trial."

18 First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv.,

19 809 F.2d at 631.  Thus, the "purpose of summary judgment is to

20 'pierce the pleadings and to assess the proof in order to see

21 whether there is a genuine need for trial.'"  Matsushita, 475

22 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

23 note on 1963 amendments); see also Int'l Union of Bricklayers &

24 Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752

25 F.2d 1401, 1405 (9th Cir. 1985).

26      In resolving the summary judgment motion, the court

9

1  examines the pleadings, depositions, answers to interrogatories,

2  and admissions on file, together with the affidavits, if any.

3  Rule 56(c); see also In re Citric Acid Litigation, 191 F.3d

4  1090, 1093 (9th Cir. 1999).  The evidence of the opposing party

5  is to be believed, see Anderson, 477 U.S. at 255, and all

6  reasonable inferences that may be drawn from the facts placed

7  before the court must be drawn in favor of the opposing party,

8  see Matsushita, 475 U.S. at 587 (citing United States v.

9  Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); See also

10  Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121,

11  1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn

12  out of the air, and it is the opposing party's obligation to

13  produce a factual predicate from which the inference may be

14  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp.

15  1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

16  Cir. 1987).

17      Finally, to demonstrate a genuine issue, the opposing party

18  "must do more than simply show that there is some metaphysical

19  doubt as to the material facts. . . . Where the record taken as

20  a whole could not lead a rational trier of fact to find for the

21  nonmoving party, there is no 'genuine issue for trial.'"

22  Matsushita, 475 U.S. at 587 (citation omitted).

23                    **III. ANALYSIS**

24  **A.   Defendant Miyamoto's Motion for Summary Judgment**

25      The plaintiffs allege that Miyamoto violated 42 U.S.C. §§

26  1983, 1985, 1986 by performing the physical exam of the

10

1   plaintiff children on May 11, 2004 and through her involvement

2   in the children's subsequent removal from the home by CPS. It

3   appears that plaintiffs allege that Miyamoto caused the

4   plaintiff children to be wrongfully removed from their family

5   home by having performed invasive and unlawful physical

6   examinations of them. Declaration of Robert Tyler in Support of

7   Defendants' Motion for Summary Judgment ("Tyler Decl.") ¶¶ 2-5,

8   Ex. A-D. It also appears that plaintiffs allege that Miyamoto

9   caused the plaintiffs children to be removed from the home by

10  reporting groundless conclusions from the physical exam to CPS.

11  Id. Therefore, resolution of the motion for summary judgment

12  centers on the appropriateness of the May 11, 2004 examinations.

13  Defendant moves for summary judgment on the grounds that the

14  examinations were consensual and non-invasive and that she

15  enjoys qualified immunity for her actions in conjunction with

16  the exams. The court grants the motion in part and denies it in

17  part.

18        **1.   There Is a Genuine Issue of Material Fact As to
                  Whether Jane Roe Consented to the Medical Examinations**

19        The Fourth Amendment guarantees the plaintiff children the

20  right to be free from unlawful searches and seizures. As the

21  Supreme Court has explained, "[i]t is now beyond dispute that

22  'the Federal Constitution, by virtue of the Fourteenth

23  Amendment, prohibits unreasonable searches and seizures by state

24  officers.' Equally indisputable is the proposition that the

25  Fourteenth Amendment protects the rights of students against

26  encroachment by public school officials." T.L.O. v. New Jersey,

1   469 U.S. 325, 334 (1985) (quoting Elkins v. United States, 364

2   U.S. 206, 213 (1960)). The Court has further explained that

3   "even a limited search of the person is a substantial invasion

4   of privacy." Id. at 337. Moreover, "[a] search of a child's

5   person ..., no less than a similar search carried out on an

6   adult, is undoubtedly a severe violation of subjective

7   expectations of privacy. Id. at 337-38; see also Calabretta v.

8   Floyd, 189 F.3d 808, 819 (9th Cir. 1999). A physical examination

9   of a minor may be unlawful unless that child's parent has

10  consented to it. Wallis v. Spencer, 202 F.3d 1126, 1141 (9th

11  Cir. 2000).[7] A non-consensual physical examination of a child,

12  therefore, implicates not only the Fourth Amendment rights of

13  the child, but the rights to familial association under the

14  Fourteenth Amendment of both the child and the parent(s). See

15  id. It is violations of these rights that underlie the

16  plaintiffs' Section 1983 claim against Miyamoto, and

17  consequently their claims under Sections 1985 and 1986 as well.

18  Miyamoto argues that because no reasonable jury could find that

19  the examinations were non-consensual, these claims must fail on

20  this basis. The court disagrees.

21      The evidence before the court clearly demonstrates a

22

23      [7]The plaintiffs, in their opposition, cite to California case
    law describing the tort of battery in the context of non-consensual
24  medical examinations. The court dismissed this claim as directed
    against defendant Miyamoto in its August 29, 2006 order. The cases
25  to which the plaintiffs refer are not helpful in the analysis of
    whether their federal Constitutional rights were violated by
26  Miyamoto's actions.

1   genuine issue of material fact as to whether Jane Roe consented
2   to the examinations of her daughters. The defendants have
3   presented the testimony of Miyamoto and the CPS case worker
4   (Sylvia Lopez) as evidence that Jane Roe was told what the
5   examinations would entail, that she spoke English, and that she
6   consented to the exams, both explicitly and through her failure
7   to object to them. Tyler Decl. ¶¶ 9-10, Ex. H-I. Defendants also
8   present the deposition testimony of Roe-Two Child, in which she
9   stated that her mother understands and speaks English.[8] Id. ¶ 7,
10  Ex. F. To counter this, plaintiffs have tendered a declaration
11  of Jane Roe, in which she states that she possesses only a poor
12  understanding of English, she did not understand the reason the
13  children were taken to CAARE, and that she did not consent to
14  their physical examinations. Roe Decl. ¶¶ 2-4. Although the
15  defendants decry Jane Roe's declaration as "self-serving," this
16  presents a quintessential credibility determination to be made
17  by a factfinder.

18      Miyamoto also argues that through her conduct, Jane Roe
19  impliedly consented to the physical examinations. An individual
20  can consent to a search or seizure if the totality of the
21  circumstance's and that individual's acts indicates that she

22  _____

23      [8]Roe-Two Child's testimony on this point is equivocal. She
24  also stated that she translated for her mother during the
    examination. Tyler Decl. ¶ 7, Ex. F at 26:11-27.
25      The court notes that there is a discrepancy between the SUF
    and Mr. Tyler's declaration as to the numbering of the exhibits.
26  The court refers to the exhibits consistent with the numbering
    given in Mr. Tyler's declaration.

consented to the intrusion. See, e.g., Pavao v. Pagay, 307 F.3d 915, 920 (9th Cir. 200). Here, defendants assert that Jane Roe was told that she could object to the exams at any time, that the exams were conducted in her presence, and that she never objected. Tyler Decl. ¶ 10, Ex. I (testimony of Miyamoto); ¶ Ex. G, 25:23-24 (testimony of Roe-One Child). Jane Roe contends that she was not informed in a language that she could understand about what was to occur during the exams. Roe Decl. ¶ 4. Additionally, the testimony of the plaintiff children, tendered by defendants, indicates that a jury could reasonably find that Jane Roe had not impliedly consented by her conduct. See, e.g., Tyler Decl. ¶ 7, Ex. F. For instance, Roe-Two Child testified in her deposition that defendant Miyamoto told Jane Roe to turn her back during the examination "because it's . . . private" and that Jane Roe did so. Id. (deposition at 26:1-27:3).[9] This conflict in the evidence is sufficient to show that a reasonable jury could conclude that under the totality of circumstances, Jane Roe did not give her implied consent to the examination.[10]

Accordingly, there is sufficient evidence tendered to the court to establish a genuine issue of material fact as to this

---

[9]It is unclear from Roe-Two Child's deposition testimony whether the child translated this to Jane Roe or whether Miyamoto spoke directly to Jane Roe and Jane Roe responded by turning around.

[10]Defendants do not argue that consent was not required because the examinations fell into the "special needs" exception under the Fourth Amendment. The court expresses no opinion on the viability of this defense.

aspect of the plaintiffs' federal claims against Miyamoto.

Summary judgment is denied on this issue.

    **2.    There Is No Genuine Issue of Material Fact That The Examinations of Plaintiff Children Were Unconstitutionally Invasive**

    Although it is unclear from the evidence before the court and from the plaintiffs' opposition papers, it appears that plaintiffs also allege that the physical examinations of the plaintiff children were unconstitutionally intrusive. Of course, a search of one's person that occurs without proper consent (or the existence of a lawful exception to the requirement of consent) would be considered unlawfully "intrusive" in a Constitutional sense. See Schleckloth v. Bustamonte, 412 U.S. 218, 222 (1973); Wallis v. Spencer, 202 F.3d at 1141. The plaintiffs have cited no authority for the notion that a physical examination can violate the Constitution because it is intrusive, even if there was lawful consent given for it. Furthermore, the plaintiffs have tendered no evidence that the May 11, 2004 examinations were conducted in a manner that is so intrusive as to be Constitutionally infirm.[11] Miyamoto's motion is granted as to the plaintiffs' first, second, and third causes of action, to the extent that they allege that the examinations were unconstitutionally intrusive.

    **3.    There Is a Genuine Issue of Material Fact As To**

---

    [11]In their opposition to defendants' motion, the plaintiffs reference a second examination of the plaintiff girls that occurred on May 13, 2004. As explained in footnote 4, *supra*, the May 13, 2004 examinations appear never to have been alleged as the basis of the plaintiffs' causes of action against Miyamoto.

1       **Whether Miyamoto Is Entitled to Qualified Immunity for Her Actions**

2     A government official is immune from liability for

3 discretionary functions, so long as the official's conduct "does

4 not violate clearly established statutory or constitutional

5 rights of which a reasonable person would have known." <u>Harlow v.</u>

6 <u>Fitzgerald</u>, 457 U.S. 800, 818 (1982). The determination of

7 whether or not a state official enjoys qualified immunity

8 proceeds in two parts. First, the court must determine whether

9 the facts show that the official's conduct violated a

10 constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

11 If so, the court undertakes the second step of the analysis,

12 which is whether the constitutional right was "clearly

13 established" at the time of the violation. <u>Id.</u> A right is

14 clearly established if a reasonable official would have

15 understood that his actions violated that right. <u>Id.</u> at 202.

16

17     Here, there is evidence sufficient to defeat the

18 defendants' motion for summary judgment on this issue. As

19 explained *supra*, a reasonable jury could conclude that the

20 plaintiffs' Constitutional rights were violated when Miyamoto

21 performed physical examinations of the plaintiff children

22 without their parents' consent.

23     If so, a reasonable jury could also find that a reasonable

24 official in Miyamoto's position would have known that there was

25 not constitutionally adequate consent given for the physical

26 examinations. It is a long-standing doctrine of Fourth Amendment

law that an official may rely on the appearance of consent for a search search only if the totality of the circumstances make such a reliance reasonable. <u>See</u>, <u>e.g.</u>, <u>Florida v. Jimeno</u>, 500 U.S. 248, 250-51 (1991). Hence, it is clearly established per <u>Saucier</u>. <u>Saucier</u>, 533 U.S. at 201-202.

The defendants argue that there is no genuine dispute that a reasonable official in Miyamoto's shoes would have reasonably believed that Jane Roe consented to the examinations of her children. The court cannot agree. The inquiry hinges on a determination of reasonableness, which is typically best left to a jury. There is sufficient evidence tendered to support a jury's conclusion that Miyamoto's belief that Jane Roe had consented was not reasonable and that a reasonable official in Miyamoto's situation would not have believed it to be reasonable. There is evidence before the court that Jane Roe could not understand nor communicate well in English. Roe Decl. ¶ 4; Tyler Decl. ¶ 7, Ex. F at 26:11-27. There is also evidence that Jane Roe had her back turned during the examination of at least one of her daughters and therefore was not observing it nor would be in a position to object if she wished to withdraw consent. Tyler Decl. ¶ 7, Ex. F (deposition at 26:1-27:3). A reasonable jury could find that a reasonable official in Miyamoto's situation, given the totality of the factual circumstances, would have known that Jane Roe had not consented to the examinations consonant with the Fourth Amendment's

1 requirements.

2     The case on which the defendants principally rely, <u>Dubbs v.</u>
3 <u>Head Start, Inc.</u>, 336 F.3d 1194 (10th Cir. 2003), does not
4 contradict this conclusion. There, the Tenth Circuit concluded
5 that two nurses were entitled to qualified immunity for
6 performing examinations of children in a Head Start Program,
7 where the nurses had been told consent had been obtained by the
8 children's parents. <u>Id.</u> at 1217. In fact, no consent had been
9 given; the children's parents had not even been informed of the
10 examinations. <u>Id.</u> at 1201. The Tenth Circuit held that the
11 nurses were objectively reasonable in believing that consent had
12 been obtained for two reasons. First, the nurses' employer, the
13 County Health Department, had been assured by the Head Start
14 agency that consent would be obtained before the exams. <u>Id.</u> at
15 1217. Second, when the nurses arrived on site to perform the
16 exams, one of the agency's employees informed the nurse that she
17 had the parents' signed consent forms "on file." <u>Id.</u> Therefore,
18 under the totality of those circumstances, a reasonable official
19 in the nurses' position would have believed lawful consent had
20 been obtained for the exams. <u>Id.</u>

21     Here, the facts are not as compelling as those encountered
22 by the Tenth Circuit in <u>Dubbs</u>. Although there is evidence
23 tendered that the CPS worker told Miyamoto that Jane Roe
24 consented to the exams, <u>see</u> SUF 8, there is evidence that, if
25 credited, may lead a fact-finder to conclude that Miyamoto was
26

unreasonable in believing that the exams were consensual. For example, there is evidence that Jane Roe possessed limited proficiency in English, the absence of an official interpreter before or during the exams,[12] and that Jane Roe was not watching the examination of at least one of her daughters. Roe Decl. ¶ 4; Tyler Decl. ¶ 7, Ex. F. All of these facts could lead a reasonable jury to conclude that even if Miyamoto was informed that Jane Roe had consented initially, a reasonable official in the same position would have questioned the reliability of that information and Jane Roe's capacity to consent initially and throughout the examinations.

Accordingly, the court concludes that summary judgment is inappropriate as to the issue of whether Miyamoto is entitled to qualified immunity for her acts relating to the May 11, 2004 examinations of the plaintiff children.

**B.   Defendant Coulter's Motion for Summary Judgment**

The plaintiffs allege that Coulter violated their federal civil rights by (1) leading the SCAN Committee, which "made the ultimate determination as to whether . . . the plaintiff children were likely victims of sexual abuse," (2) drafting the California Office of Emergency Services' California Medical

---

[12]It appears from the record that Roe Two Child translated for Jane Roe during the examination.  Tyler Decl. ¶ 7, Ex. F. This evidence seems to cut both ways, as it is evidence that Jane Roe was being communicated to in Vietnamese during the exam, but a jury might reasonably question the reliability of a child interpreting a description of a sensitive procedure that she herself was undergoing.

1  Protocol for Examination of Child Abuse and Neglect Victims,

2  utilized by CAARE staff, and (3) participating in the review of

3  the photographs taken during the May 11, 2004 exam.[13] SUF ¶¶ 30-

4  31. Finally, the plaintiffs Roe-One Child and Roe-Two Child

5  allege that Coulter is vicariously liable for the tort of

6  assault and battery committed on them, and that he violated

7  their right to privacy under state law by "authorizing,

8  ratifying and affirming" the May 11, 2004 exam. The court grants

9  the motion.

10     The plaintiffs have tendered the following evidence in

11  support of their claims against Dr. Coulter. First, there is

12  evidence that the juvenile dependency proceedings stemming from

13  the May 11, 2004 events were dismissed, and that neither

14  plaintiff parent was ever criminally charged with child abuse,

15  neglect, or any similar charge. Palik Decl. ¶¶ 2-4. Second, the

16  plaintiffs have tendered a letter apparently drafted by Coulter

17  on November 29, 2004 to the Deputy District Attorney.[14] Gabaeff

18  Aff. ¶ 4, Ex. C. In the letter, Coulter emphasized the

19  importance of considering the child's personal and medical

20  history when assessing the likelihood that the child experienced

21  _____

22     [13]The plaintiffs had previously alleged that Coulter also

23  violated their civil rights by approving and ratifying Miyamoto's
    conduct and by being her supervisor. In their opposition, they

24  abandon these grounds for their claims. See Opposition to
    Defendants' Motion for Summary Judgment at 6.

25     [14]Dr. Gabeaff purports to rely on this letter in forming his

26  expert opinion and this assertion does not appear to the court to
    be disingenuous, despite defendants' contention otherwise.

1  abuse or neglect. Id.

2       Finally, the plaintiffs present the deposition testimony of

3  Coulter, in which he described his role in the SCAN committee.

4  He described the committee as a weekly group of representatives

5  from different agencies who exchange information about the

6  progress of cases and who is involved with them. Palik Decl. ¶

7  9, Ex. H. In the deposition he stated that the committee does

8  not talk about whether the district attorney's office might

9  prosecute an individual for child abuse or neglect. Id. He also

10 specifically testified that, as medical director, he was not

11 responsible for choosing which CAARE personnel would attend the

12 SCAN meetings. Id. Instead, the personnel involved in each case

13 attended the meetings as a matter of course. Id.

14      This comprises the entirety of the evidence tendered to

15 support the plaintiffs' causes of actions against Coulter. As

16 Coulter points out, plaintiffs have tendered no evidence that he

17 was involved in the physical examinations of the plaintiff

18 children in any capacity, nor any evidence that he was involved

19 in any capacity in the decision to remove the plaintiff children

20 from their home. Although the plaintiffs repeatedly argue that

21 Coulter testified in his deposition that Coulter had authority

22 to appoint participants to the SCAN committee and that the SCAN

23 committee made decisions about prosecutions of abuse and neglect

24 ////

25 ////

26

cases, Coulter's deposition in fact states the exact opposite.[15]

Similarly, the plaintiffs have tendered no evidence that Coulter drafted the OES Protocol and, although it is undisputed that Coulter participated in a review of the photographs taken of the plaintiff children's examinations, there is no evidence tendered as to how his involvement caused any of the alleged harms to the plaintiffs. In fact, the only evidence before the court that describes why CPS removed the plaintiff children from their home on May 11, 2004 establishes that the decision was made only based on Miyamoto's conclusions about the exam results. Tyler Decl. ¶ 9, Ex. H. In sum, there appears no evidence before the court that there was a causal connection between Coutler's actions and the alleged harms suffered by the plaintiffs. At the summary judgment stage, this absence of evidence is fatal to the plaintiffs' claims.[16]

### IV. CONCLUSION

Accordingly, the court ORDERS as follows:

1.    Defendant Miyamoto's motion for summary judgment is
       GRANTED IN PART.

---

[15]Even if the plaintiffs were correct in their characterization of Coulter's description of the SCAN committee, plaintiffs have tendered no evidence of causation. There is no evidence before the court suggesting that the SCAN committee discussed the plaintiff girls' May 11, 2004 examinations and, if so, that the committee made any recommendations regarding them.

[16]Because the court rules on this grounds, it need not address Coulter's defense that he was immune under California law.

22

2.  Defendant Coulter's motion for summary judgment is
    GRANTED. Defendant Coulter is DISMISSED from this
    action.

3.  Defendant County of Sacramento's motion for summary
    judgment is GRANTED. Defendant County of Sacramento is
    DISMISSED from this action.

IT IS SO ORDERED.

DATED: April 8, 2008.

                              _____
                              LAWRENCE K. KARLTON
                              SENIOR JUDGE
                              UNITED STATES DISTRICT COURT